Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 9651 | **DATE** | 9/29/2003 |
| **CASE TITLE** | Wallace vs. Publicis and Hal Riney | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   For the reasons set forth on the attached order, the Court grants Publicis's motion for summary judgment (9-1). Defendant's motion for sanctions (12-1) was previously denied and is therefore terminated. The trial date of 1/5/04 is vacated. Judgment is entered in favor of Publicis.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | SEP 29 2003 | |
| | Notified counsel by telephone. | | date docketed | 24 |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT CLERK | | |
| OR | courtroom deputy's initials | 03 SEP 29 PM 2:55 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHELLE WALLACE, )
)
Plaintiff, )
)
vs. ) Case No. 01 C 9651
)
PUBLICIS AND HAL RINEY, )
an Illinois Corporation, )
)
Defendant. )

DOCKETED
SEP 2 9 2003

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Michelle Wallace has sued her former employer, Publicis and Hal Riney ("Publicis") for race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, and 42 U.S.C. § 1981. She alleges that Publicis failed to promote her and ultimately fired her because of her race. Publicis now moves to dismiss. For the reasons outlined below, the motion is granted.

### Facts[1]

Publicis is an advertising agency with offices in several cities in the United States. Michelle Wallace, an African American woman, was employed in the company's Chicago office

---

[1] The Court notes that Wallace has moved to strike several paragraphs in Publicis' Local Rule 56.1 statement of facts (¶¶ 8, 10, 15, 17, 20, 21, 22, 25, 27, 28, 30, 35, 36, 37, 40, 41, 42, 45, 46, 47, 48, and 52) as non-factual, argumentative and not concise as required by the Local Rules. The motion is denied. Though many of the paragraphs that Wallace identifies attribute certain beliefs and opinions to the parties and witnesses in the case, these "belief statements" are supported by citations to deposition testimony and other facts in the record and are proper under the Local Rules. The Court also concludes that the paragraphs at issue are reasonably concise. We further note that Wallace's motion to strike these paragraphs does not excuse her failure to respond them. To the extent that Wallace has failed to dispute the factual assertions contained in each of these paragraphs, those facts are deemed admitted under Local Rule 56.1(b). The Court denies as moot Wallace's motion to strike the Declaration of Cheryl Miller as we did not consider it in reaching our decision.

as an administrative assistant beginning in January, 1999. Pl's 56.1 Resp., ¶ 5. As an administrative assistant, Wallace worked on the Subway advertising account. Def's Ex. M (Wallace Dep.) at 59. When the agency lost the account in the fall of 1999, she was reassigned to a position as a creative coordinator on the Del Webb account and worked in that capacity through the end of her employment with the agency. Def. Ex. M (Wallace Dep.) at 76-77. The creative coordinator position was new to the agency, and was designed to add administrative support to the creative department in order to improve work flow. Def's Ex. N (Krause Dep.) at 51. As described to her by Ted Barton, her supervisor, Wallace's role as a creative coordinator was to serve as a "point person" between the production staff and the creative staff to make sure "everything rotated where it was supposed to be." Def's Ex. M (Wallace Dep.) at 63. Publicis hired one other creative coordinator, Kristin Giese, who was assigned to the Whirlpool account. Def's Ex. S (Giese Dep.) at 7.

Wallace experienced some difficulties in her position as a creative coordinator. Def's Ex. M (Wallace Dep.) at 80-81. During the middle of her tenure, she approached Barton to have him clarify or give new meaning to her role. *Id.* Kristin Giese, the other creative coordinator, experienced frustration in her job as well. Pl's Ex. S (Giese Dep.) at 13-14. She felt that the Whirlpool team didn't understand her role and concluded that the creative coordinator position added an unnecessary layer of red tape. *Id.*

In September 1999, Publicis hired Zach Hilder, a former intern, as a junior copywriter. Def's 56.1 Stmt., ¶ 11. According to Publicis, Hilder was hired based in part on his performance as an intern, and the agency made efforts to restructure its budget in order to make a place for him. Def's Ex. N (Krause Dep.) at 73-74, Def. Ex. O (Barton Dep.) at 42. Wallace tells a

different story. Though she cannot recall whether the position was advertised or posted, she claims that the junior copyright position to which Hilder was hired was known throughout the agency to be available during the summer of 1999 and that she was denied the chance to apply for it. She states that she approached Richard Coad, a creative director at the Chicago office, to express interest in the position but was turned away. Def's Ex. M (Wallace Dep.) at 28-29. Wallace claims that Hilder was considered for the job and hired because he is white.

On April 7, 2000, Publicis terminated Wallace's employment. Pl's 56.1 Stmt., ¶ 37. According to Publicis, the creative coordinator positions occupied by Wallace and one other employee, Kristin Giese, were eliminated as part of a business reorganization plan. Def's Ex. N (Krause Dep.) at 87. In the first week of April 2000, Publicis had hired a consultant, John Meyer, to address continuing inefficiencies on the Del Webb account. *Id.* at 85-86. According to Publicis, the company implemented several of Meyer's recommendations, including the elimination of the creative coordinator position. *Id.* at 86. Wallace claims that the reorganization was simply a pretext for discrimination and that she was discharged because she is African-American.

### Discussion

Under Rule 56(c), summary judgment may be granted only if there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is considered "genuine" if a reasonable trier of fact could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether or not a genuine issue of material fact exists, we must view the facts in a light favorable to Wallace, the non-moving party in this case, drawing all inferences in her favor. *Celotex*, 477 U.S. at 322.

3

Wallace's claims are based on Title VII and § 1981. The requirements for proving a race discrimination claim under both statutes are essentially the same. *Von Zuckerstein v. Argonne National Labortory*, 984 F.2d 1467, 1472 (7th Cir. 1993). In bringing either type of claim, she can prove her case through direct evidence of discriminatory intent, or through the indirect, *McDonnell Douglas* burden shifting method. Though Wallace has offered some evidence of racial animus on the part of certain employees at Publicis, she offers no direct evidence of discriminatory intent on the part of the decision makers, and must therefore rely on the burden-shifting method of proof. *See Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1403 (7th Cir. 1996).

To survive summary judgment under the indirect method, Wallace must make out a prima facie case of discrimination. In a typical failure to promote case, a plaintiff must show that she (1) was a member of a protected group; (2) applied and was qualified for the position sought; (3) was rejected for the position; and (4) the position was granted to a person outside of the protected group who was not better qualified. *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003). A plaintiff must also show that she applied and was qualified "'for a job for which the employer was seeking applicants.'" *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1118 (7th Cir. 1992) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

Wallace's claim does not quite fit this mold. It is undisputed that the junior copywriter position at issue was not a posted, available position. Pl's Resp. at 6. Though Hilder, a white male outside Wallace's protected class, was hired as a junior copywriter, neither he nor Wallace "applied" for the position, and he was not chosen over Wallace in any conventional sense. Wallace cannot therefore, avail herself of the inference of discrimination that typically

4

accompanies a showing that a white applicant for a position was picked over a competing black applicant with similar or better qualifications. This does not mean that she cannot raise a genuine issue of fact as to her race discrimination claim. *See Flores v. Preferred Technical Group*, 182 F.3d 512, 515 (7th Cir. 1999) ("the prima facie case cannot be used by rote but must be adapted to fit the varying facts of discrimination cases"). Wallace might defeat summary judgment if she could provide some circumstantial evidence that she was denied a chance to become a junior copywriter because of her race. But the Court concludes that she has failed to carry that burden.

Publicis states that Hilder participated in Publicis' intern program and was well regarded during his tenure. It offers deposition testimony that indicates that the junior copywriter position at issue in Wallace's claim was established at its Chicago office specifically to accommodate Hilder. At his deposition, Ted Barton, the executive creative director of the Chicago office, explained that the agency's intern program was designed to allow college students to experience the agency and that he and his staff looked out for interns with "real talent." Def's Ex. O (Barton Dep.) at 41. He testified that Hilder displayed the kind of talent and attitude the agency was seeking, noting that Hilder was proactive and positive and often came forward with solutions to problems. *Id.* at 42. When pressed for a specific example of Hilder's performance, Barton mentioned that Hilder worked on the advertising account for Subway, and that he was instrumental in tracking down "Jared," Subway's now-famous television commercial spokesperson. *Id.* Barry Krause, the chairman and CEO of the Chicago office, confirmed at his deposition that the agency was impressed with Hilder's work and that Barton approached him to see if he could "juggle some things around in the budget" to keep Hilder as a full-time employee.

Def's Ex. N (Krause Dep.) at 74. Publicis thus asserts that the junior copyright position was created specifically so that the agency could offer Hilder a job.

Though Wallace contends that she should have been considered for a junior copywriter position and that she was turned away when she expressed interest in the job, she offers no evidence to refute Publicis' account of Hilder's hiring. Nor has she presented any other evidence from which the Court might conclude that Publicis rejected her inquiries into the position because of race. Rather, she argues that she was qualified for the job and was not given a fair chance to apply for it. Evidence of her qualifications, without more, however, is not a cognizable discrimination claim. *See Brill v. Lante Corp.*, 119 F.3d 1266, 1271 (7th Cir. 1997) (plaintiff must show that she was qualified for a promotion and that her employer's reasons for rejecting her were discriminatory or pretextual). Because there is no basis from which a reasonable factfinder could disbelieve Publicis' contention that it created the junior copywriter position for Hilder, and that the position was simply not available to others, Wallace has provided no evidence from which disparate treatment can be inferred. As to her failure to promote claim, summary judgment is granted.

Wallace's discriminatory discharge claim is susceptible to a more standard analysis but requires us first to explore the background of her termination. Publicis maintains that Wallace was terminated as part of a business reorganization. According to Publicis, during Wallace's tenure as a creative coordinator, the agency hired a consultant, John Meyer, to sort through perceived problems on the Del Webb account, the work team to which Wallace was assigned. Def's Ex. O (Barton Dep.) at 45. Barton, who made the ultimate decision to fire Wallace, and Krause, the chairman of Publicis' Chicago office, testified that Meyer recommended certain

changes that the company implemented, including the elimination of the creative coordinator position. Publicis thus contends that Wallace was not singled out for termination but rather was laid off as part of restructuring. The evidence reflects, however, that Kristin Giese, the only other creative coordinator, resigned around the time the position was eliminated. Def's Ex. S (Giese Dep.) at 10. Giese says that she had a feeling that the position would be eliminated. *Id.*, at 14. Thus the agency's alleged restructuring resulted in the firing of a single creative coordinator: Wallace.

In this respect, Wallace's termination resembles what in the ADEA context the Seventh Circuit has termed a "mini-reduction in force" (mini-RIF). *See e.g., Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875-876; *Bellaver v. Quanex Corp.*, 200 F.3d 485, 495 (7th Cir. 2000) (applying the mini-RIF concept in a race discrimination case and describing a mini-RIF as a single discharge case in which an employee is terminated and not replaced, and her duties are absorbed by other employees not in the protected class). To raise an initial inference of discrimination in a mini-RIF case, a plaintiff is not required to identify similarly situated employees who were not terminated, *see Bellaver*, 200 F.3d at 495, because there are none. That is the case here; no creative coordinators other than Wallace were let go. But in this context, Wallace must show that employees outside of her protected class absorbed her responsibilities. *Id.* Wallace has failed to make this showing. The only evidence she offers that her duties were absorbed by anyone at all is the deposition testimony of Dina Holmes (a person who Wallace fails to identify, but who Publicis describes as an employee in its Broadcast Production Department) who states that "if anyone took Michelle's job, then this girl (an Asian woman whose name she does not recollect) did." Holmes Dep. at 13. This testimony, the foundation for

7

which has not been shown, is insufficient to create a genuine issue of fact on the point. The admissible evidence in the record supports Publicis' explanation that duties of the creative coordinator position were actually eliminated as part of an effort to manage the business differently.

Even if Wallace could raise an initial inference of discrimination, she has failed to show that Publicis's account of her termination lacks credence. As evidence that the agency's alleged restructuring was a cover-up, Wallace points to two letters, one written by John Meyer and one apparently written by Ted Barton, which she says show that the restructuring Publicis claims resulted in her termination did not take place until May 19, 2000–more than one month after she was fired. Def's Exs. K and L. In fact, the exhibits to which Wallace refers are facsimiles of undated letters that appear to have been faxed on May 19, 2000. Meyer's letter states: "[t]he organization of the agency as it pertains to internal workflow needed to be shifted to a more aggressive and comprehensive model. ... The decision to release the creative coordinator positions within the agency resulted from the need to hire qualified, experienced traffic managers to facilitate the new model." Def's Ex. K. The second letter, apparently written and signed by Barton, states: "John Meyer was hired April 4, 2000 with the authority to make recommendations as to how to restructure the Del Webb team as a start to reworking the integrated systems within the agency. It was up to John to organize and do as he saw fit. I passed onto John all issues and concerns. As a result, all creative coordinator positions were eliminated." Def's Ex. L. Publicis argues without contradiction that these letters were prepared and faxed to Publicis's headquarters as the foundation for the position statement it submitted to the EEOC in response to Wallace's discrimination charge. *See* Def's 56.1 Resp., Ex. W at ¶¶ 3-4. In any event, the letters do not

appear to be contemporaneous explanations for Wallace's firing or the agency's restructuring because they are written in the past tense, and if anything they appear to support Publicis' position that the restructuring took place in April.

Wallace next argues that Publicis has undermined the credibility of its explanation for her firing by presenting evidence that she was a "problem employee." Though it might be inconsistent for Publicis to maintain both that Wallace was fired for poor performance and as part of agency restructuring, Publicis has consistently argued only the latter. The evidence of Wallace's performance that is in the record, in particular a copy of an e-mail voicing concerns about Michelle's work as a creative coordinator, appears to have been included in the record to support Publicis' version of the events leading up to the elimination of Wallace's job. *See* Defs Ex. G. That e-mail message and two apparent follow up messages also attached as exhibits to Publicis's brief, *see id.* and Def's Ex. H, indicate that Wallace's colleagues on the Del Webb account were concerned that her role on the account was superfluous, that the impact of her work might be negative, and that Publicis took some action before she was terminated to clarify and revise her duties. There are no inconsistencies between this evidence and Publicis' contention that Wallace's job was eliminated. Wallace herself has offered a memorandum written by Barry Krause which discusses the e-mails that Publicis has attached and indicates that he sought the opinion of other agency directors as to whether the position Wallace occupied on the Del Webb account was necessary and whether they felt that Wallace added value to the agency. Pl's Ex I (Krause Mem.). Nothing contained in that memorandum, which expresses doubts as to Wallace's ability to "fit into the positive, productive working environment" at Publicis, runs contrary to the agency's account of her termination.

Finally, as circumstantial evidence of Publicis's alleged discrimination against African-Americans, presumably advanced as evidence of pretext, Wallace offers the declaration of Inez Smith, a former Publicis employee. Smith states that on several occasions, her supervisor Pat Nathan commented to her that African-Americans are treated unfairly at Publicis. Pl's Ex. H. For example, she states that Nathan once remarked that "in Publicis, Blacks are dispensable." *Id.* at ¶ 5. Smith also recounts racial slurs she claims were directed towards her such as "she doesn't know her place," and "she's an uppity Nigger." *Id.* at ¶ 8(c). And Smith states that a Manager for Publicis discussing Wallace's termination said to her "you know how this agency is with blacks, you just have to ignore it." *Id.* ¶ 13. Though the contents of Smith's declaration, if accurate, are troubling, this is not evidence from which a reasonable jury could find that discrimination played a role in Wallace's firing. The Seventh Circuit has made clear that stray remarks of persons not involved in the employment action at issue in a discrimination case cannot alone support an inference of discrimination. *See Fuka*, 82 F.3d at 1403-04 (7th Cir. 1996). None of the remarks recounted in Smith's declaration are attributed to Wallace's supervisors, and those that relate to her termination are attributed to persons uninvolved in the decision to eliminate her job.

The Court finally addresses what appears to be a third claim of discrimination. In her opposition papers, Wallace appears to base her Title VII and § 1981 claims on the additional ground that Publicis discriminated against her when it refused to reimburse her for French language classes she took during her tenure at the agency. This apparent allegation does not support a claim under Title VII because denial of tuition reimbursement, particularly where an employee has no expectation that she will be reimbursed, is not a material adverse employment

10

action. *See Fyfe v. City of Fort Wayne*, 241 F.3d 597, 602-03 (7th Cir. 2001) (discretionary denial of reimbursement for travel expenses did not cause a materially adverse change in the terms and conditions of employment because reimbursement was not an expected element of salary). To the extent that Wallace could make a claim of this type under § 1981, she has failed to sustain such a claim because she has presented no evidence that white employees making similar reimbursement requests were treated differently. Though she insists that a white employee, Nicole Zotaley, was reimbursed for a graphic design class, she presents only evidence that Zotaley took the class, not that she was reimbursed. *See* Pl's Ex. N. In any event, Wallace has failed to rebut Publicis's explanation that proficiency in French was not sufficiently related to her essentially administrative duties in the company to warrant reimbursement for her French classes.

## Conclusion

For the reasons stated above, the Court grants Publicis's motion for summary judgment [docket item 9-1]. Defendant's motion for sanctions [docket item 12-1] was previously denied and is therefore terminated. The trial date of January 5, 2004 is vacated. The Clerk is directed to enter judgment in favor of Publicis.

Date: September 29, 2003

MATTHEW F. KENNELLY
United States District Judge

11